No. 22,393.

CHARLES HICKMAN and B. E. KENNEDY, Partners, etc., *Appellees*, v. THE UNION OIL COMPANY OF WICHITA, *Appellant*.

SYLLABUS BY THE COURT.

1. DRILLING OIL WELL — *Terms of Contract Stated — Contract Not Breached.* A contract which provides for drilling an oil well to the top of the sand or to a depth of 2,600 feet, and which provides that the driller shall inspect the machinery, rig, casing, and other appliances furnished by the owner of the well with which to do the drilling, and which provides that if the driller fails to make such inspection or to notify the owner of any defect discovered in the machinery, rig, casing, or other appliances, the driller shall asume all the risk and responsibility for any defect except for one impossible to discover, implies that the owner of the well is responsible for any defect impossible to discover in the machinery, rig, casing, or other appliances, if proper inspection is made; and the contract is not breached by the driller's failure to drill the well to the top of the sand or to a depth of 2,600 feet if such failure is caused by a collapse of the casing which prevents the completion of the well, if the collapse of the casing is caused by a defect impossible to discover.

2. SAME—*Inspection—Evidence.* There was evidence to show that the plaintiffs inspected the casing furnished by the defendant.

3. SAME—*Collapse of Casing.* The defendant is liable for work done at its request after the collapse of the casing caused by a defect which it was impossible for the plaintiffs to discover by inspection.

4. SAME—*Recovery of Lost Tools.* There was evidence which tended to show that the collapse of the casing was not caused by the plaintiffs in an effort to recover the tools lost by them in the well.

5. SAME—*Well Taken Over by Lessor.* There was evidence which tended to show that the defendants took over the well after the collapse of the casing, and this question was properly submitted to the jury.

6. SAME—*Collapse of Casing—Recovery of Lost Tools.* No new con-

sideration was necessary to render the defendant liable for the work done by the plaintiffs at the request of the defendant, to recover the tools that were lost and to save the well after the collapse of the casing.

7. SAME—*Instructions.* The court correctly instructed the jury concerning the liability of the defendant for work done by the plaintiff at the request of the defendant after the casing collapsed.

8. SAME. The court correctly instructed the jury concerning the measure of damages.

9. SAME—*Verdict—Certain Items Not Included.* A certain sum of $2,-100 was not submitted to the jury by the instructions of the court and does not apear to have been included in the verdict.

Appeal from Butler district court: ALLISON T. AYRES, judge. Opinion filed April 10, 1920. Affirmed.

*S. B. Amidon, D. M. Dale, S. A. Buckland, H. W. Hart,* and *Glenn Porter,* all of Wichita, for the appellant.

*A. L. L. Hamilton, J. B. McKay,* and *George J. Benson,* all of El Dorado, for the appellees.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiffs and the defendant entered into a contract by which the plaintiffs agreed to drill an oil well to the top of the sand, or to the depth of 2,600 feet, for $2.25 a foot. The well was drilled to a depth of 2,210 feet, and then abandoned. The plaintiffs commenced this action to recover the $2.25 a foot for the depth to which the well was drilled, and to recover damages caused the plaintiffs by the defendant. Judgment was rendered in favor of the plaintiffs for $10,152, and the defendant appeals. The contract was in part as follows:

"This agreement made and entered into this 28th day of Sept., 1917, by and between Hickman & Kennedy, parties of the first part, and The Union Oil Company of Wichita, Kansas, parties of the second part.

·       ·     ·   ·      ·      ·      ·   · ·    ·      ·      ·     ·      ·

"That all fuel and water is to be furnished at the expense [of the party] of the second part.

"That the said well, unless sooner abandoned by directions of the party of the second part, is to be drilled to the top of the sand or to a depth of 2,600 feet, and the consideration for which shall be $2.25 per foot.

"That for the pulling of casing and cleaning out after the well is

completed, party of the second part agrees to pay $60.00 per day of twenty-four hours and $30.00 for twelve-hour tower.

"That the party of the second part agrees to pay for labor only while mudding, tubing and pumping the well; also to furnish extra men to help case said well, said men to be paid by the said second party.

"Said second party to pay $60.00 per day of twenty-four hours and $30.00 per day of twelve hours for straight underreaming and to furnish underreamer when needed.

.    .    .    .    .    .    .    .    .    .    .    .    .

"That the party of the first part shall carefully inspect the rig, machinery, casing and other appliances to be furnished for said well by the party of the second part and if any defects be found therein sufficient to make the machinery, rig, casing or other appliances unsafe, they shall immediately notify the party of the second part of such defect or defects, and the party of the second part shall at once replace the article so found defective with a good and safe one; but if the party of the first part shall not make such inspection or shall not report defect in such rig, machinery, casing and other appliances, the party of the first part shall be deemed to have assumed all risk and responsibility for any mishap, except any defect impossible to detect, which may occur in the drilling of said well by reason of a defect in such rig, machinery, casing or other appliance."

When the well had been drilled to a depth of 2,210 feet, the plaintiffs lost some tools in the well, and while attempting to recover them the casing above them collapsed, and the well was not completed.

1. The defendant contends that, "Appellees breached their contract and failed to complete the well as provided by the contract," and that therefore the defendant is not liable to the plaintiff in any sum whatever. This compels an examination of the contract. It provided that the plaintiffs should inspect the machinery, rig, casing, and other appliances furnished by the defendant with which to drill the well. The contract also provided that if the plaintiffs did not make such inspection or notify the owner of any defect discovered in the machinery, rig, casing, or other appliances, that they should be deemed to have assumed all risk and responsibility for any mishap, except that caused by any defect impossible to detect. Under this provision of the contract the plaintiffs, if they failed to make the inspection required, were liable for the consequences, but if they did make such inspection and were unable to detect any defect, although one existed, the defendant was liable for the consequences of that defect.

The jury answered special questions as follows:

"Question 1. Do you find that there was a defect in the casing? Answer to Question 1. Yes.

"Question 2. If you answer the above question in the affirmative please state of what said defect consisted. Answer to Question 2. From weakness which it was impossible to detect.

"Question 3. If you answer question 1 in the affirmative, then state whether it was impossible to detect said defect by careful inspection, and if you find that it was impossible to detect the same, then state why it was impossible. Answer to Question 3. We find it impossible to detect it by careful inspection until said casing was subjected to outside and above pressure."

These answers were supported by evidence. There was evidence which tended to show that the casing collapsed from outside pressure at the depth of about 2,100 feet, and that on account of the collapse of the casing the plaintiffs were unable to complete the well. It follows that the plaintiffs were entitled to recover the contract price for the depth to which the well was drilled; that they were entitled to recover the damages sustained by them by reason of the collapse of the casing; and that the contract was not breached by the failure to drill to the top of the sand or to a depth of 2,600 feet.

2. The defendant argues that there was "no evidence that appellees examined the casing that collapsed," and that therefore they were not liable for the consequences flowing from an accident caused by a defect in the casing.

B. E. Kennedy, one of the plaintiffs, on cross-examination, testified in part as follows:

"Q. And you did not take it upon yourself to look for the casing or anything of that sort, to inspect or do anything of that kind? A. Yes, sir; I always looked at my pipe. . . . I always look at the casing and I looked at it before it was run into the hole.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. Yes, sir; I always looked at my pipe.

"Q. You always looked at your pipe? A. Yes, sir.

"Q. When did you look at it? A. I always looked at it before they run it into the hole.

"Q. Did you look at this pipe before it was run into the hole? A. Yes, sir.

"Q. Before it was ever run into the hole? A. Yes, sir.

"Q. Did you ever look at it after that? A. I saw it once after that.

"Q. You saw it there on the rack? A. Yes, sir.

Hickman v. Union Oil Co.

"Q. You did not go to the trouble of going over it carefully or anything of that kind? A. Yes, sir, I did this one time.

"Q. Which time was it. A. It was when we pulled the pipe to straight rim.

"Q. When you pulled the pipe to straight rim? A. Yes, sir.

"Q. And that was the 8-in. pipe? A. Yes, sir.

"Q. About when was that? A. I think it was in January."

Lewis Clinger, one of the workmen, testified in part as follows:

"Q. Did you see that casing run into the well? A. Yes, sir.

"Q. Did you help run it in? A. Yes, sir.

"Q. What was its condition in regard to being in good, ordinary, substantial condition at the time you commenced to drill again? A. It was good."

Frank Jones, another of the plaintiff's workmen, testified with reference to the examination of the casing that was last run in the hole, as follows:

"Q. Tell the jury whether you saw any or observed any? A. No, sir. I did not see any or I would not have run it."

That evidence showed that the casing was examined.

3. The defendant contends that there was "no evidence that appellant was to pay appellees for swedging, cleaning out, jarring, fishing for tools or drilling up pipe, and court erroneously submitted the same to the jury." B. E. Kennedy testified that Mr. Dillinger, the defendant's drilling superintendent, had the plaintiffs clamp up the pipe, start swedging, run the bailer, cut the wire line, feather-edge a bit, dress it to a sharp edge, run the bit through the collapsed pipe, pull the casing, clean out the well, make an impression block and run it to find out the condition of the casing, and shut down the well. These things were done by the plaintiffs at the request of the defendant after the casing had collapsed, and the doing of them was made necessary by that accident if any further efforts were to be made to complete the well. The plaintiffs were entitled to recover for that work, and the right to recover compensation therefor was properly submitted to the jury.

4. The defendant further contends that the "appellees losing their tools in hole, cause of casing collapsing and loss of well." There was evidence which tended to show that the casing collapsed by reason of the improper operation of the

plaintiffs; however, there was evidence to the contrary. Mr. Jones, who gave evidence concerning the work that was done, testified as follows:

"Q. Now during any of that time was anything done that a reasonable and prudent and careful oil driller would not have done that you know of? A. No, sir."

### J. N. Breman testified in part as follows:

"I am a tooldresser and have been for three years; I have been in the oil business 19 or 20 years. I was a driller for 11 years. If an 8-inch bit were lost in the bottom of a well 2,210 feet deep and the 8-inch casing was set to a depth of 2,130 feet and that had been tested and found dry, the ordinary and prudent thing to do would be to run the slip socket and recover the lost bit.

"Q. I will ask you, Mr. Breman, to state from your experience as an oil-well driller and contractor, in a hole 2,210 feet deep and there was a sliver joint of eight-inch casing above the tools about 30 feet and between the bottom of the sliver joint and the top of the tools the hole was full of casing, if you would say from your experience as a driller if the hole was in a condition to recover the tools? A. Under those circumstances I would have to put that hole in shape to get that hole in hope to get it out of there.

"Q. I will ask you from your experience as a driller, and oil-well contractor, if it would be a reasonable, safe and prudent and an ordinary thing to do to resume drilling in a hole that was 2,210 feet deep and in which an 8-inch casing had been set to 2,130 feet and the hole had been tested and found to be dry?

"Q. I mean is that a reasonable and prudent thing to do? A. Certainly it would.

"Q. Is it possible for these slips to come in contact with the casing? A. Not if they are set in the socket properly."

From that evidence the jury was warranted in finding that the efforts of the plaintiffs to recover the lost tools did not cause the casing to collapse.

5. The defendant also contends that "the court erred in submitting to the jury the question of the appellant taking over the well." In stating the plaintiff's pleadings to the jury the court said:

"That said casing collapsed on or about February 25, 1918, and plaintiffs immediately notified the defendant of the collapsing of said casing and ceased drilling operations, and upon the following day the defendant took complete charge of said well and attempted to remove such collapsed casing therefrom but failed to do so and thereby rendered it impossible for plaintiffs to drill further and complete said well."

Upon that question the court gave the following instruction:

"If you find from the evidence that said casing collapsed and that thereafter defendant, through its agents, took charge of said well, and directed the manner in which subsequent operations were conducted thereon and failed to carry on and conduct subsequent operations as the average, careful and prudent operator would have done in like circumstances, and thereby rendered it impossible to complete said well, then your verdict would be for the plaintiffs, unless you should further find from the evidence that the collapsing of said casing was due to the negligence and carelessness of the plaintiffs in the respects claimed by the defendant."

The acts of Dillinger outlined in the third subdivision of this opinion should be considered in the determination of this question. Those acts tended to show that the defendants did take over the well; and the question was properly submitted to the jury.

6. The defendant argues that there was "no consideration for any agreement of appellant to take over the well," and that it was necessary for the plaintiffs to show a consideration for such an agreement. The well was drilled on the lease of the defendant. What the plaintiffs did was done to save the well and avoid the consequences of the collapsed casing. The well was of no value to the defendant unless it could be drilled deeper, and the defendant was liable to the plaintiffs for the contract price of the well and for the damages sustained by them in consequence of the collapsed casing. The defendant was justified in attempting to save the well and avoid those damages, and no other consideration was necessary when the defendant took over the well. This conclusion is a consequence of the written contract that had been entered into by the parties to this controversy.

7. The defendant also contends that "the court erred in instructing the jury with reference to new or supplemental contract." A careful examination of the instructions has been made, and this court has been unable to find any such instruction, unless the one complained of is the one numbered 5 of the instructions given by the court. That instruction has been examined, and the court is unable to find error in it.

8. Another contention is that "the court erred in instructing the jury with reference to the measure of damages." The

measure of damages has been partly discussed under the first subdivision of this opinion. In addition to what was there said, it may be now stated that the defendant was liable for the damages sustained by the plaintiffs by reason of the defendant's failure to perform its contract in any particular.

The court instructed the jury that the plaintiffs were entitled to recover the damages sustained by them by reason of the failure of the defendant to furnish oil and water for use in drilling the well. The contract provided that the defendant should furnish these articles to the plaintiffs. The evidence showed that there was delay in furnishing them, and that as a consequence the plaintiffs sustained damages, which they were entitled to recover under the contract. Other damages were claimed by the plaintiffs and were probably allowed by the jury under the instructions of the court, but no error is perceived in the instructions, and none has been pointed out.

9. Complaint is made of an item, claimed by the plaintiffs, of $2,100 for waiting for orders for 35 days, April 10 to May 18, inclusive, twenty-four hours each, at $60 a day. The plaintiffs asked judgment against the defendant for $12,510.23. The verdict and judgment was for $10,152, or $2,358.23 less than the amount for which judgment was asked. An examination of the instructions discloses that the court did not submit to the jury the claim for $2,100 for waiting on orders, and it cannot be said that that amount was included in the judgment.

The judgment is affirmed.